**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

---

CONVERGEN ENERGY WI, LLC,
        Plaintiff,

vs.

L'ANSE WARDEN ELECTRIC COMPANY, LLC,
        Defendant.

Case No. 3:20-cv-0543

Dane County Wisconsin
Cir. Ct. Case No. 20-cv-1199

---

**RENEWED MOTION AND SUPPORTING ARGUMENT FOR PRELIMINARY INJUNCTION**

---

**MOTION**

Plaintiff Convergen Energy WI, LLC ("CE-Wisconsin"), by its attorneys Benjamin J. LaFrambois and William E. Fischer of the law firm of von Briesen & Roper, s.c., hereby moves the Court pursuant to Federal Rule of Civil Procedure and in the interests of justice for an Order granting a preliminary injunction against the Defendant, L'Anse Warden Electric Company, LLC ("L'Anse"). This motion is supported by the June 12, 2020 Affidavit of Theodore J. Hansen filed in Dane County Circuit Court Case No. 20-cv-1199 ("Hansen Aff."), the accompanying Statement of Record Facts Proposed by the Movant, and the Argument set forth below.

**ARGUMENT**

As related in the accompany proposed record facts, a dispute has arisen under a Supply Agreement between the parties to this matter, which requires immediate injunctive relief to maintain the status quo pending resolution of the dispute. Until January 31, 2020, CE-Wisconsin and L'Anse were owned by the same conglomerate, Libra Capital US Inc. (Libra). CE-Wisconsin

Prior to the acquisition, CE-Wisconsin sold fuel pellets L'Anse. However, as part of the negotiations for the acquisition, BMO Harris Bank, which had extended credit to both parties, required the parties to enter into a Supply Agreement, which explicitly gave BMO a collateral interest in the agreement and thereby ensured that business would continue between the two companies after the acquisition.

The parties did perform under the Supply Agreement until April 4, 2020, at which time L'Anse inexplicitly halted payments, while still taking possession of and consuming fuel pellets supplied by CE-Wisconsin. This choice by L'Anse coincides with a dispute raised by Libra regarding the sale of CE-Wisconsin. Libra has contended elsewhere that both the acquisition of CE-Wisconsin and (relevant to this case) the negotiation of the Supply Agreement were fraudulent. CE-Wisconsin believes that this is the pretext under which L'Anse has ceased payment, while at the same time continuing to demand supply from CE-Wisconsin.

The Supply Agreement requires arbitration, but explicitly recognizes that a party may need to seek injunctive relief to require a party to perform during the pendency of any dispute:

> Each party acknowledges and agrees that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms. Accordingly, pending completion of arbitration pursuant to this provision, either party shall have the right to seek a temporary restraining order, injunctive relief or other interim or provisional relief on the grounds that such relief would otherwise be available at law or in equity. If any such relief is obtained, the arbitrator will address the continuance, modification or termination of such relief, and the decision regarding such relief shall be binding on the parties.

(Hansen Aff., Exh. A, pg. 7, ¶ 11.)

The paramount argument in support of issuing a preliminary injunction is the nature of the Supply Agreement itself. A key component is that the agreement is premised on the BMO's

collateral interest in the agreement (*id*., Exh. A, p.1), including the fact that BMO retains the right to determine whether default has occurred and that the contract can be terminated. In that regard, the Supply Agreement is in the nature of a "take or pay" arrangement, whereby both parties can meet their obligations to a lender only if they to continue to meet their obligations under the contract until such time as a dispute has been resolved by the arbitrator.

Here, unlike most other preliminary injunction disputes, the Supply Agreement itself specifically contemplates that the parties must continue to perform during the pendency of any dispute, and expressly endorses entry of temporary injunctive relief to enforce that provision. This arguably removing any discretion with regard to whether an injunction should issue—it's issuance is a matter of contract, and judgment on the merits of the claim or any defenses is therefore specifically reserved to the arbitrator.

In addition to the plain language of the contract, the traditional factors for a temporary injunction are easily met. For a injunction to issue under Rule 65, the moving party must demonstrate that it will suffer irreparable harm for which there is no other adequate remedy at law, and that the movant has some probability for success on the merits. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). Upon a showing of those factors, courts must then balance the likelihood of irreparable harm to either party, against the irreparable harm caused to the non-moving party, should the court grant the requested relief. *Id*. "In so doing, the court employs a sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id*., *quoting Roland Machinery Co. v. Dresser Indus.*, 749 F.2d 380, 387 (7th Cir. 1984). Preliminary injunctions are concerned with maintaining

the status quo: "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981)

Each of the factors required for a preliminary injunction in this matter have been met. The question of irreparable harm is answered by the language of the Supply Agreement itself, under which the parties recognize and acknowledge "that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms." (Hansen Aff., Exh. A., ¶ 11, p.7). Parties to a contract are free to allocate risk as necessary for the bargain, and "the goal is to hold parties to that agreement so that each receives the benefit of his or her bargain." *Wausau Title, Inc. v. County Concrete Corp.*, 226 Wis. 2d 235, 247, 593 N.W.2d 445 (1999). The parties' agreement decides the question of irreparable harm as part of the bargain struck, and therefore no further inquiry is required.

CE-Wisconsin has a reasonable probability of success on the merits in the arbitration. L'Anse has not and cannot state a bona fide reason why it should not have to pay for fuel pellets that it has taken possession of and (presumably) consumed in its electric plant. First—the contract between the parties could not be more clear. When CE-Wisconsin provides pellets, which are then accepted by L'Anse, L'Anse is required to pay for them in accordance with the clear and unambiguous terms of the agreement. No defense that could be raised by L'Anse—either on its own or on Libra's behalf—negates this fact.

CE-Wisconsin presumes that any opposition to this motion will be based on allegations made in the larger dispute between CE-Wisconsin and Libra. Libra has contended in its complaint in the Southern District of New York that the viability of the Supply Agreement is suspect on the

4

basis of fraudulent inducement related to the sale of CE-Wisconsin, and has asked for rescission of the Supply Agreement. L'Anse's argument presumably would be that it should not be required to pay in accordance with the terms of a fraudulent contract.

However, even if the allegations of fraudulent inducement were true (which it is not), the viability of the Supply Agreement still does not affect the common sense proposition that CE-Wisconsin is still owed compensation for the goods it has supplied. First and foremost, again, the parties specifically bargained with regard to maintaining operations under the Supply Agreement during the pendency of any dispute. CE-Wisconsin's motion merely seeks to enforce this clear, unambiguous language.

Even if the Court ignores these clear terms, several other basic legal concepts support the conclusion that CE-Wisconsin ought to be paid for pellets during the course of the dispute. First, quantum meruit requires that CE-Wisconsin be fairly paid for value it has provided. *See Ramsey v. Ellis*, 168 Wis. 2d 779, 784, 484 N.W.2d 331 (1992) ("Recovery in quantum meruit is allwed for serices performed for another on the basis of a contract implied by law to pay the performer the reasonable value of those services.")

Similarly, CE-Wisconsin is due just compensation for the value of its product on the theory of unjust enrichment, which requires compensation where a plaintiff confers a known benefit upon a defendant, where it would be inequitable for the defendant to retain the benefit without paying the value of it. *See Sands v. Menard*, 201 WI 110, ¶ 29, 379 Wis. 2d 1, 18, 904 N.W.2d 789.

Moreover, in the absence of a valid controlling agreement between parties for the sale of goods, the default provisions of the Uniform Commercial Code would apply. Under a UCC, sellers' remedies for non-payment of goods accepted by the buyer and after the risk of loss has

transferred to the buyer include an action for the price of the goods. Wis. Stat. §§ 402.703(5); 402.709.

CE-Wisconsin therefore meets the threshold inquiry of demonstrating irreparable harm and likelihood of success. Further, the balance of harms weighs in CE-Wisconsin's favor. *Girl Scouts of Manitou Council, Inc.*, 549 F.3d at 1086. The irreparable harm caused to CE-Wisconsin is a foregone conclusion as a matter of the language of the contract. The relative harm to L'Anse is comparatively slight—all it would be required to do would be to continue to pay for product that it accepted without complaint, and has consumed in its facility. There has been no suggestion or implication that L'Anse does not have the ability to pay for the goods. Moreover, the term of this injunction will be brief—only until such time as an arbitrator is appointed and can address the issues.

The injunction will do no more than " preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Texas*, 451 U.S. at 395. Prior to L'Anse's failure to pay, the status quo was that CE-Wisconsin would provide pellets at an agreed-upon price, and that L'Anse would pay for them. "The status quo that will be preserved by a preliminary injunction is the last, actual, peaceable, noncontested status that preceded the pending controversy, as it presently or formerly existed." 43A C.J.S. Injunctions, § 27; It appears to be L'Anse's intent to continue to order more fuel pellets, while not paying for them. This is not the status quo. Rather, the status quo sought by CE-Wisconsin would merely require the parties to continue to perform under the Supply Agreement, as written, until such time as the arbitrator can take up the issue.

## **CONCLUSION**

Under the facts and law, CE-Wisconsin is entitled to a preliminary injunction. CE-Wisconsin respectfully asks the Court to enter an order requiring L'Anse to continue to perform under the Supply Agreement, including payment of amounts currently due, as well as payment for future fuel pellet deliveries, which order shall terminate pursuant to the Supply Agreement at such time as the arbitrator is appointed and has reviewed and ruled on the issue.

Dated this 16th day of June, 2020.

By: s/William E. Fischer
Benjamin D. LaFrombois, SBN: 1027910
William E. Fischer, SBN: 1045725

von BRIESEN & ROPER, s.c.
2905 Universal Street, Suite 2
Oshkosh, WI 54904
Phone: (920) 233-0250
blafrombois@vonbriesen.com
wfischer@vonbriesen.com

*Attorneys for Plaintiff Convergen Energy WI, LLC*