# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

CONVERGEN ENERGY WI, LLC,

        Plaintiff,

vs.

L'ANSE WARDEN ELECTRIC COMPANY, LLC,

        Defendant.

Case No. 3:20-cv-0543

Dane County Wisconsin
Cir. Ct. Case No. 20-cv-1199

## PLAINTIFF'S REPLY IN SUPPORT OF RENEWED MOTION
## FOR PRELIMINARY INJUNCTION

## INTRODUCTION

L'Anse Warden Electric Company, LLC's ("LWEC," a member of the Libra group) response brief is couched in vicious rhetoric, distorts what is actually occurring in the Southern District of New York almost beyond recognition, and is supported by a declaration of someone who did not even work at Libra until after the Supply Agreement was consummated. LWEC's overly dramatic, fanciful tale is an exercise in subterfuge, meant to mislead the Court into ignoring the clear language of the Supply Agreement, drawing premature conclusions about a supposed "fraud" that did not occur, and subverting CE-Wisconsin's right to due process.

When one clears away LWEC's smoke, mirrors and alternative facts, the simple truth of the matter remains the same. CE-Wisconsin has been performing under the Supply Agreement by supplying hundreds of thousands of dollars' worth of fuel pellets to LWEC. LWEC also performed under the Supply Agreement until April 1, 2020, but since then has refused to pay for pellets that it receives and burns, resulting in a failure to perform. Moreover, LWEC has stated that it intends to keep taking CE-Wisconsin's pellets without paying for them (a fact which LWEC attempts to evade in its responses to CE-Wisconsin's statement of facts (*see* Doc. No. 23, ¶13)). The Supply

Agreement contains an arbitration clause, requiring precisely this type of dispute to go to arbitration and, notably, providing that the arbitrator has the exclusive authority to decide:

> any disagreement, controversy or claim that arises between Vendor and Customer regarding the interpretation, fulfillment, or implementation of any provision of this Agreement, or regarding the rights and obligations of the parties (**including, without limitation, the validity of the agreement of the parties to arbitrate, the arbitrability of the issues submitted to arbitration hereunder, and any conflict of laws issued in connection with this Agreement**).

(Hansen Aff., Doc. No. 7, Exh. A, p. 6, § 11 (emphasis added).) The Supply Agreement further explicitly recognizes a party's right to seek injunctive relief to require performance under the contract, during the limited time before the arbitrator can review the issue. The Supply Agreement further recognizes (in a clause drafted by Bert Diaz, Libra's General Counsel) that a failure to perform by either party is a *prima facie* showing of irreparable harm.

LWEC contorts itself, the law, and the facts in order to get around the simple, logical, and unambiguous language of the Supply Agreement. Where LWEC cannot evade that language, it simply cries "fraud!" and "unconscionability!" (again, without any actual proof), in the hopes that, if it yells loud enough, the Court will ignore the contract and the law, and be fooled into denying the temporary relief sought by CE-Wisconsin. Such a result is clearly a miscarriage of justice, and as such, CE-Wisconsin's motion for temporary preliminary relief should be granted.

## ARGUMENT

**I. CE-WISCONSIN HAS MET ALL REQUIREMENTS FOR A PRELIMINARY INJUNCTION.**

   **A. CE-Wisconsin Has Demonstrated that it has a Clear Likelihood of Success on the Merits.**

   **1. LWEC Fails to Refute CE-Wisconsin's Showing that LWEC has Taken Hundreds of Thousands of Dollars of Pellets Without Paying for Them.**

CE-Wisconsin invoked the arbitration clause under the Supply Agreement, because LWEC has failed to pay for over $300,000 worth of fuel pellets, and has stated that it will continue to

order such pellets, with no intent to pay for them. In its response, LWEC does not deny that it has failed to pay for pellets, or that it intends to keep ordering them without paying; instead, LWEC dodges those questions with evasive responses to CE-Wisconsin's proposed findings of fact. (*See* Doc. No. 23, ¶¶ 10, 12-13.) Despite those efforts, the record before the Court demonstrates quite clearly that LWEC has failed to perform under the Supply Agreement, and intends to continue to fail to perform under the Supply Agreement. As such, CE-Wisconsin has an overwhelming likelihood of success on its contract claims in the arbitration. As noted in CE-Wisconsin's opening brief, even if the Supply Agreement is adjudged avoidable at some point in the future, several quasi-contract theories of relief support its claim.

## 2. LWEC's Argument that the Supply Agreement was a Result of Fraud Should be Rejected, Because it Rests Entirely on Inadmissible Hearsay and Unproven Allegations.

LWEC bends over backwards to avoid these simple truths, instead choosing to attack the viability of the Supply Agreement in general, and the arbitration clause in particular, on the basis of unproven allegations that the Supply Agreement is fraudulent, and that the arbitration clause is unconscionable. In other words, instead of arguing that CE-Wisconsin's claim is wrong, LWEC relies on defenses properly heard in the arbitration, which is exactly the stated purpose of the arbitration clause, and therefore only serves to emphasize CE-Wisconsin's argument.

Regardless, LWEC offers nothing in the way of admissible proof to support either its theory of fraud or its assertion of unconscionability. Instead, LWEC relies upon unproven allegations in the just-initiated SDNY case, and the wholly inadmissible declaration of Camilo Patrignani, who supposedly made the declaration "on personal knowledge," but who in reality was not even

employed by Libra/LWEC at the time the Supply Agreement was signed. (Supplemental Declaration of Theodore Hansen, filed herewith ("Hansen Dec."), ¶ 3.)[1]

In reality, the Supply Agreement was signed at arm's length by two sophisticated parties who are assumed to understand and agree to the risks of the bargain that was struck. *Children's Surgical Foundation, Inc. v. Natl. Data Corp.*, 121 F. Supp.2d 1221, 1225-26 (N.D. Ill. 2000). Contrary to Mr. Patrignani's (inadmissible) aversion, the Supply Agreement was not "created" by any supposed bad actors (Doc. No. 22, ¶ 14); rather, it was drafted by Bert Diaz, Libra's current General Counsel. (Hansen Dec., ¶ 4.) Indeed, Mr. Diaz specifically drafted the "irreparable harm" clause in the arbitration paragraph. (*Id*.)

The Supply Agreement was signed on LWEC's side by Fidel Andueza, who wore (and continues to wear) numerous hats in the Libra organization, including as Libra's Chief Investment Officer. (*Id*., ¶ 5.)[2] As of January 31, 2020, Mr. Andueza possessed the actual and apparent authority to bind LWEC in the Supply Agreement and (along with Mr. Diaz) participated in devising the terms of the Supply Agreement on behalf of LWEC. (Id., ¶ 6.) Importantly, Mr. Andueza, as an authorized agent of LWEC and Libra, was fully aware of Steven Brooks' involvement and interest in both the Supply Agreement, as well as the acquisition of CE-

---

[1] Because Mr. Patrignani could not have personal knowledge of the "facts" to which he avers, his entire declaration should be disregarded as impermissible hearsay under FRE 801. Mr. Patrignani's declaration also violates this court's standing order on procedure for injunction motions, which states: "Affidavits must be made on personal knowledge setting forth facts that would be admissible in evidence, including any facts necessary to establish admissibility." (WDWI Procedure to be Followed on Motions for Injunctive Relief, n.3.)

It is a valid question to wonder why LWEC provides a declaration from Patrignani, when Andueza and Diaz—who are still employed by Libra, and who were directly involved in the drafting, negotiation and consummation of the Supply Agreement—were presumably available. No doubt LWEC and Libra want to continue to shield those individuals from perjuring themselves. This points up the kernel of truth in all of this that will eventually come to light. Libra's own executives negotiated the Supply Agreement (as well as the acquisition agreement) with full knowledge of all of the facts, including Brook's involvement. However, instead of cleaning their own house, Libra has masterminded this entire miscarriage of justice in order to shift focus from aware from a major failure in corporate governance to pin the blame on others. The cries of fraud may be the actual fraud.

[2] In addition to being Libra's CIO, at least prior to January 31, 2020, Mr. Andueza was also the Manager/President of CE-Wisconsin, Convergen Energy LLC, LWEC, and Convergen Energy, Inc.

Wisconsin. (*Id*., ¶ 7.) LWEC's and Libra's assertions that Libra was unaware of Mr. Brooks' role in the transactions is the lynchpin of their aversions of fraud, both as to the Supply Agreement as well as to the acquisition that is the primary focus of the SDNY action. Without that fact, this entire case is exposed for the sham that it is.

Mr. Andueza, as the LWEC signatory on the Supply Agreement, is presumably the "unnamed co-conspirator" referenced in Mr. Gold's declaration, and repeated in LWEC's brief. (Doc. No. 21, ¶ 11; Doc. No. 20, p.1.) As a preliminary matter, Mr. Gold's averment should be disregarded—it is an unsupported argumentative statement of counsel, at best hearsay, and holds absolutely no evidentiary value. Further, for support Mr. Gold refers only to the complaint in the SDNY action, which in itself is not evidence. (*Id*.) Moreover, contrary to Mr. Gold's statement that the involvement of an "unnamed co-conspirator" is "fully explained" in the NYSD action, review of that complaint reveals that there is no mention of such a shadowy figure in New York. (*See generally,* Fischer Dec., Doc. No. 25, Exh. B.)[3]

Stripped of the house of cards on which it stands, LWEC's "fraud" argument is therefore revealed for what it is: a collection of theories and unproven allegations—it certainly does not overcome the clear language of the Supply Agreement providing for interim injunctive relief, or the arbitration clause itself. LWEC's assertion that the arbitration clause in the contract is somehow "unconscionable" fails for the same reason—it is based on the same unproven assertion that the Supply Agreement is a result of fraud. But a party cannot circumvent an arbitration clause

---

[3] As detailed in CE Wisconsin's brief in response to LWEC's motion to transfer, this is not the only time where LWEC takes substantial liberties with its description of exactly what is happening in the SDNY. As in its brief in support of its motion to transfer, LWEC persists in the fiction that the TRO in New York has anything to do with the supply agreement. Here, LWEC literally puts words into Judge Liman's mouth: "The New York court understood that there really is no justifiable explanation for the double dealing that resulted in the recent sale of CEW for millions less than it is worth and revised supply terms that shifted millions in profit to CEW under the contested supply agreement." (Doc. No. 20, p.1.) LWEC provides no citation for this statement because it cannot—any proceedings that have occurred in the SDNY, including the TRO, have been limited in scope to the preservation and migration of supposed trade secret and confidential information. The suggestion that Judge Liman has opined at all as to the merits of LWEC's fraud allegations is patently false.

5

merely by claiming fraud or that the agreement is unconscionable. *See Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress Int'l, Ltd.,* 1 F.3d 639, 643 (7th Cir. 1993) ("A party may not avoid a contractual commitment to arbitrate disputes merely by 'casting its complaint in tort.'" (citation omitted)); *see also Nitro-Lift Techs., L.L.C. v. Howard*, 568 U.S. 17, 20-21 (2012) (challenges to the overall validity of a contract containing the arbitration clause must be decided by the arbitrator, not by a court); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967) (same); *Harter v. Iowa Grain Co.*, 220 F.3d 544, 550 (7th Cir. 2000) (courts will not allow a party to unravel a contractual arbitration clause by arguing that the clause was part of a contract that is voidable).

None of the cases cited by LWEC stand for the proposition that mere unproven allegations of fraud or unconscionability will subvert an arbitration clause. *See Loop Products v. Capital Connections, LLC*, 797 F. Supp. 2d 338, 347-48 (S.D.N.Y. 2011) (New York law) (holding arbitration clause unenforceable on the basis of uncontroverted allegations of fraud in an unanswered complaint); *332 E. 66th St., Inc. v. Walker,* 59 Misc. 3d 1216(A), 106 N.Y.S.3d 727 (N.Y. Sup. Ct. 2018) (New York law) (refusing to invalidate an arbitration provision without a developed record); *Comprehensive Merch. Catalogs, Inc. v. Madison Sales Corp.*, 521 F.2d 1210, 1213 (7th Cir, 1975) (New York law) (proposition cited by LWEC taken from a quote from a New York decision; 7th Cir. did not opine as to merits); *Anderson St. Realty Corp. v. New Rochelle Revitalization, LLC*, 78 A.D.3d 972, 974 (2010) (New York law) (overruling lower court and holding that case should have gone to arbitration for lack of showing of fraud relating to arbitration clause); *Wisconsin Auto Title Loans, Inc. v. Jones*, 2005 WI App. 86 ¶10, 280 Wis. 2d 823, 696 N.W.2d 214 (recognizing that an evidentiary hearing is ordinarily required to determine unconscionability, but determining that the party waived its right to a hearing); *Brennan v. Bally Total Fitness*, 198 F. Supp.2d 377, 382 (S.D.N.Y. 2002) (New York law) (finding arbitration

provision unconscionable after considering extensive factual record); *Coady v. Cross Country Bank,* 2007 WI App 26, ¶26, 299 Wis. 2d 420, 439, 729 N.W.2d 732 (holding that arbitration clause in credit card agreement was unconscionable after extensive review of facts, and in light of uneven bargaining power between the parties).[4]

### 3. Potential Future Claims of "Offset" Have No Bearing on This Court's Decision.

LWEC next contends that, because it may one day win a damages award in the SDNY that might offset damages caused to CE-Wisconsin due to LWEC's failure to perform the Supply Agreement, it should not have to pay for the hundreds of thousands of dollars of pellets it has already consumed, and the millions of dollars more pellets it will consume over the course of this dispute. Apparently, LWEC expects that CE-Wisconsin should just sit idly by and supply hundreds of thousands of dollars-worth of pellets, without getting paid anything for them. This argument is patently absurd, and none of the cases cited by LWEC support this sort of premature application of potential offset.

### 4. LWEC Ignores that the Arbitration Clause Reserves Questions of Validity and Arbitrability to the Arbitrator, not the Court.

Boiled down to its essence, LWEC's argument against the temporary preliminary injunction requested by CE-Wisconsin is that the entirety of the Supply Agreement—including the

---

[4] Apparently believing that New York law is more favorable to its cause, particularly with regard to the severability and continued viability of an arbitration clause when other terms are invalidated, LWEC argues that New York law should be applied by the Court in this matter. However, LWEC's insistence on New York law completely ignores the choice of law provision in the Supply Agreement, requiring the application of Wisconsin law. (Hansen Aff., Doc. No. 7, Exh. A p. 6, § 7). Moreover, LWEC ignores the fact that issues as to choice of law are reserved to the arbitrator. (*Id.*, p. 6, § 11) LWEC's choice of law cases are inapposite, because none were decided in light of a clear contractual choice of law provision applicable to the claim at bar. *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 158 (2d. Cir. 2012) (no contractual choice of law provision); *Love v. Blue Cross & Blue Shield of Georgia, Inc.,* 439 F. Supp.2d 891, 892 (E.D. Wis. 2006) (acknowledge choice of law provision in insurance contract, but did not consider it in determining choice of law in insurance bad faith tort claim); *State Farm Mut. Auto. Ins. Co. v. Gillette,* 2002 WI 31, ¶49, 251 Wis. 2d 561, 588, 641 N.W.2d 662 (no choice of law provision cited by the court); *Sutherland v. Kennington Truck Serv. Ltd.*, 454 Mich 274, 286, 562 N.W.2d 466 (1997) (no choice of law provision).

7

arbitration clause specifically allowing for the injunctive relief requested in this case—must be thrown out due to the supposed fraudulent scheme. Even if LWEC could provide some colorable proof of fraud or unconscionability to this Court (which it has not), it fails to even acknowledge—much less discuss—the fact that the arbitration clause in the Supply Agreement reserves all questions of arbitrability and conflicts of law to the arbitrator itself:

> All Disputes shall be exclusively, finally and conclusively settled by binding arbitration under the Rules of Arbitration of the American Arbitration Association in accordance with its CAR(AA) (R) (specifically modified by this Agreement). **The parties shall continue to perform their respective obligations under this Agreement pending conclusion of the arbitration**. As used herein, Dispute means any disagreement, controversy or claim that arises between Vendor and Customer regarding the interpretation, fulfillment, or implementation of any provision of this Agreement, or regarding the rights and obligations of the parties (**including, without limitation, the validity of the agreement of the parties to arbitrate, the arbitrability of the issues submitted to arbitration hereunder, and any conflict of laws issues in connection with this Agreement**).

(Hansen Aff., Doc. No. 7, Exh. A, p. 6, § 11 (emphasis added).)

It is axiomatic that arbitration clauses are a matter of contract, and that parties agreeing to an arbitration clause should be held to the terms of the agreement: "Under the [Federal Arbitration] Act, arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529, 202 L. Ed. 2d 480 (2019).

> Applying the Act, we have held that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy. We have explained that an agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other. … **When the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract. In those circumstances, a court possesses no power to decide the arbitrability issue**."

*Id.* (emphasis added) (internal quotations omitted); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-24 (1983) ("any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 221 (1985) (courts must "rigorously enforce agreements to arbitrate"); *see also id.* at 218 (the Federal Arbitration Act "leaves no place for the exercise of discretion by a district court, but instead mandates that the district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."); *Nat'l R.R. Passenger Corp. v. Chesapeake & Ohio Ry. Co.*, 551 F.2d 136, 140 (7th Cir. 1997) (a dispute must be sent to arbitration "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." (quoting *United Steelworkers of Am. V. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).

Under this precedent and the language of the Supply Agreement, neither this Court nor the SDNY will decide whether the Supply Agreement or its arbitration clause are unenforceable due to fraud. The parties expressly delegated that question to arbitration, so any discussion of fraud is a question for the arbitration. The sole issue properly before the Court on the CE-Wisconsin's preliminary injunction motion is whether this Court should (as authorized by the parties in the Supply Agreement in recognition of the fact that arbitrators cannot issue injunctions) order the interim relief required by the Supply Agreement until the arbitrator can rule.

**B. LWEC's Failure to Perform under the Agreement Presents an Unacceptable Risk of Irreparable Harm.**

LWEC asserts that the only harm that CE-Wisconsin seeks to avoid with its injunction motion is monetary—i.e., non-payment of invoices for pellets that LWEC has taken and burned without paying. LWEC's argument is an oversimplification that fails to accurately capture the stakes. As noted in CE-Wisconsin's complaint and preliminary brief, the Supply Agreement is a

"take or pay" contract for critical supplies for LWEC. CE-Wisconsin pellets are the only ones approved by Michigan regulators, and as such, LWEC must have them to continue operation. This is why BMO insisted that language be inserted into the agreement giving BMO a collateral interest, and giving BMO the right to cure defaults. Further, the continued performance of the Supply Agreement is a condition of BMO's continued agreement to finance both CE-Wisconsin and LWEC.

LWEC's brazenly intentional failure to pay CE-Wisconsin, along with its stated intent to continue to take CE-Wisconsin's pellets without paying, endangers both companies. The failure to pay, if not corrected, will begin tipping dominoes, risking BMO's withdrawal of the financial support to both parties that is conditioned upon the continuation of the Supply Agreement. The withdrawal of that support would be a disastrous and potentially existential threat to CE-Wisconsin (and likely LWEC as well). (Hansen Dec., ¶ 8.)

CE-Wisconsin asserts three additional bases in support or a finding of irreparable harm. First, the Supply Agreement is a material part of the credit agreements both parties have with BMO Harris Bank N.A. ("BMO"):

> The parties hereby acknowledge that each party has entered into a Collateral Assignment, dated January 31, 2020, with BMO Harris Bank N.A. (the "Bank"), pursuant to which each party has (A) collaterally assigned to the Bank all of its right, title and interest of, in and to this Agreement and any extensions or renewals of this Agreement, and (B) granted to Bank a security interest in and to all rights and remedies of such party arising under this Agreement (each, a "Collateral Assignment", and collectively, the "Collateral Assignments"). Each party hereby consents to the Collateral Assignment entered into by the other party and hereby acknowledges and agrees to the terms thereof.

(Hansen Aff., Doc. No. 7, Exh. A, p.1.) LWEC's failure to honor the terms of the Supply Agreement jeopardizes CE-Wisconsin's relationship with BMO, endangers the collateral CE-

Wisconsin has pledged in its credit agreement with BMO, and threatens CE-Wisconsin's ability to access credit that serves as the lifeblood of CE-Wisconsin's ability to continue its operations.

Second, the Supply Agreement accounts for around 50 percent of CE-Wisconsin's overall sales. (Hansen Dec. ¶ 9.) LCEW's persistent failure to pay anything at all for the pellets CE-Wisconsin is required to provide to LCEW under the Supply Agreement (and LCEW is required to accept) has seriously compromised CE-Wisconsin's ability to carry out its core business functions. (*Id*.) If this continues, CE-Wisconsin will be forced to scale back operations, laying off essential Wisconsin employees whose specialized training and experience in this niche industry cannot be easily replaced. (*Id*. ¶ 10.) Without access to credit and faced with an irreparable loss of talent, CE-Wisconsin will not exist in its current form (if at all) after lengthy arbitration. (*Id*.)

Third, CE-Wisconsin operates as part of a complex supply chain that includes key relationships with essential third-party suppliers, transportation partners, and storage facilities. (*Id*., ¶ 11.) Without LCEW's required payments under the Supply Agreement, CE-Wisconsin cannot pay its business partners, which will irreparably damage these key relationships. (*Id*.) These third parties will not wait quietly until LCEW is ordered to honor its commitments. Damages at the end of arbitration will not make CE-Wisconsin whole.

In summary, the Supply Agreement, written by Libra's General Counsel, mandates that the parties "continue to perform their respective obligations under this Agreement pending conclusion of the arbitration," and later confirms that, given the nature of the agreement, failure by either party to perform would result in irreparable damage to the other party. (Hansen Aff., Doc. No. 7, Exh. A, pp. 6-7, § 11.) That language only makes explicit the implicit threat to the existence of the parties, should the other not perform because a dispute is pending. Indeed, as stated in one of LWEC's own cases, a contractual statement of irreparable harm is "not without significance,"

when coupled with an additional demonstration of irreparable harm. *Int'l Creative Mgmt., Inc. v. Abate*, No. 07 CIV. 1979 PKL, 2007 WL 950092, at *6 (S.D.N.Y. Mar. 28, 2007).[5]

### C. The Balance of Harms Weighs in CE-Wisconsin's Favor.

LWEC's response ignores an important aspect of Seventh Circuit jurisprudence relating to whether a preliminary injunction should be granted. Upon a movant's showing of irreparable harm and likelihood of success, courts must then balance the likelihood of irreparable harm to either party, against the irreparable harm caused to the non-moving party, should the court grant the requested relief. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of America, Inc.,* 549 F.3d 1079, 1086 (7th Cir. 2008). "In so doing, the court employs a sliding scale approach: '[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor.'" *Id., quoting Roland Machinery Co. v. Dresser Indus.,* 749 F.2d 380, 387 (7th Cir. 1984).[6]

Here, CE-Wisconsin has demonstrated both its likelihood of success, and that LWEC's behavior is likely to harm both parties, by endangering their relationships with BMO. LWEC, in contrast, does not even attempt to explain how an order requiring it to keep performing under the Supply Agreement would harm it. Indeed, it is difficult to imagine how requiring a party to pay for goods it has consumed could be considered harmful. There is no allegation that LCEW's cash

---

[5] CE-Wisconsin's showing of harm beyond the non-payment of invoices therefore factually distinguishes this case from others cited by the defendant. *See Int'l Ass'n of Machinists Dist. 10 v. Wisconsin*, 194 F. Supp. 3d 856, 865 (W.D. Wis. 2016) (Denying injunction motion for failure to show irreparable harm beyond contract term); *Epic Sys. Corp. v. Tata Consultancy Servs. Ltd*., No. 14-CV-748-WMC, 2016 WL 6477011, at *1 (W.D. Wis. Nov. 2, 2016) (same); *Baker's Aid, a Div. of M. Raubvogel Co. v. Hussmann Foodservice Co.*, 830 F.2d 13, 16 (2d Cir. 1987) (same).
[6] Notably, LWEC cites the Second Circuit case of *Faiveley Transp. Malmo AB v. Wabtec Corp*., 559 F.3d 110, 118 (2d Cir. 2009), presumably for the proposition that the "irreparable harm" factor is the "most important prerequisite" for a Court to address in a preliminary injunction analysis. LWEC fails to note that *Faiveley's* formulation of preliminary injunction standards has been abrogated. *See Salinger v. Colting*, 607 F.3d 68, 74–75 (2d Cir.2010) (announcing that the standard for injunctive relief provided in *Faively* had been abrogated by *eBay, Inc. v. MercExchange*, 547 U.S. 388, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006)).

flow has been affected. Certainly, the consumers of electricity are receiving their power and remitting payment.

## II. LWEC'S OTHER ARGUMENTS ARE UNAVAILING.

Likely recognizing the weakness of its evidentiary showing, LWEC's posits a number of other ancillary arguments, none of which apply to the Court's decision in this case, and all of which are meritless.

### A. Forum Shopping.

LWEC accuses CE-Wisconsin of forum-shopping and filing anticipatory actions, in order to gain a more favorable jurisdiction. As a preliminary matter, this argument has nothing to do with the issue currently before the Court of whether to grant the limited injunctive relief requested.

Regardless, LWEC's argument is belied by the fact that LWEC is, itself, guilty of forum shopping by filing an action in the SDNY. Both the Supply Agreement that is the subject of CE-Wisconsin's arbitration demand, and the acquisition agreement that is central to the SDNY action, are subject to binding arbitration clauses. A third agreement that has been raised in the SDNY action requires suits to be filed in courts in Madison, Wisconsin. Those agreements clearly spell out the forum in which disputes are to be decided, **none** of which requires litigation in the Southern District of New York. Despite this, LWEC and Libra filed suit in the SDNY. If anyone is guilty of forum shopping, it is LWEC and Libra. LWEC's cases, none of which were decided in light of an arbitration clause, are therefore inapposite. *OMC LLC v. S&E Gourmet Cuts, Inc.*, No. 16-CV-833-WMC, 2017 WL 3484964, (W.D. Wis. Aug. 14, 2017) (no arbitration clause); *Skiva Int'l, Inc. v. Minx Int'l Inc.*, No. 15-CV-4580 KBF, 2015 WL 5853854, (S.D.N.Y. Oct. 7, 2015) (Same).

### B. Claim-Splitting.

LWEC also takes CE-Wisconsin to task for claim-splitting, but this argument similarly lacks merit. Again, this argument has nothing to do with the issue currently before the Court of whether to grant the limited injunctive relief requested.

Regardless, far from claim-splitting, CE-Wisconsin is merely attempting to have each issue heard in the forum designated in the respective agreement. This case seeking limited injunctive relief was filed pursuant to the terms of the Supply Agreement, with the expectation that the full dispute will be heard by the AAA, as specified in the parties' contract. Similarly, the Eastern District of Wisconsin complaint has been amended to seek a declaration that disputes under the acquisition agreement—currently the subject of the SDNY case—must go to arbitration. While the issue of whether the SDNY should hear disputes arising under contracts that are subject to arbitration clauses has not been joined, let alone decided, CE-Wisconsin and the other defendants in the SDNY case will be raising those issues in their response to the claims, currently due July 17. The cases cited by LWEC are distinguishable, because none of them dealt with matters that were clearly subject to arbitration clauses, as is the case here. *See Roumann Consulting Inc. v. Symbiont Constr., Inc.*, No. 18-C-1551, 2019 WL 3501527 (E.D. Wis. Aug. 1, 2019) (no arbitration clause); *Scholz v. United States*, No. 19-CV-1074, 2020 WL 3051565 (E.D. Wis. June 8, 2020) (Same).

## **CONCLUSION**

LWEC's attempts at obfuscation aside, common sense and the interests of justice clearly dictate that the requested preliminary injunctive relief should be granted until such time as either the question of AAA vs. SDNY jurisdiction is decided. Indeed, that is what is explicitly recognized in the language of the Supply Agreement itself. For these reasons, CE-Wisconsin respectfully asks the Court to grant its request for a preliminary injunction.

Dated: June 25, 2020

By: *s/Benjamin LaFrombois*
Benjamin D. LaFrombois, Esq., SBN: 1027910
William E. Fischer, Esq., SBN: 1045725
VON BRIESEN & ROPER, S.C.
2905 Universal Street, Suite 2
Oshkosh, WI 54904
Direct Dial: 920.233.4704
Email: blafrombois@vonbriesen.com
*Attorneys for Plaintiff Convergen Energy WI, LLC*