```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  10/5/2020
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
:
CONVERGEN ENERGY WI, LLC,                                         :
:
:
Plaintiff,                                :
-v-                                                               :    20-cv-5240 (LJL)
:
L'ANSE WARDEN ELECTRIC COMPANY, LLC,                              :    OPINION AND ORDER
:
Defendant.                                :
:
------------------------------------------------------------------X

LEWIS J. LIMAN, United States District Judge:

Plaintiff Convergen Energy WI, LLC ("Plaintiff" or "CEW") moves, pursuant to Fed. R. Civ. P. 65, for a preliminary injunction compelling Defendant L'Anse Warden Electric Company, LLC ("Defendant" or "L'Anse") to continue to perform under a supply agreement pursuant to which CEW supplies fuel pellets to L'Anse, including to compel L'Anse to pay for amounts currently due and for future fuel pellet deliveries.

## BACKGROUND

The background facts of this case have been laid out in the Court's prior opinions.[1]

Plaintiff owns a proprietary process to convert waste materials, such as paper and plastic, into a coal substitute fuel pellet. Dkt. No. 7 ("Hansen Decl.") ¶ 3. Defendant is a subsidiary of Convergen Energy, LLC ("Convergen") that produces electric power utilizing, in part, the CEW pellets as fuel. Prior to January 31, 2020, L'Anse and CEW were under the common ownership of Convergen, and ultimately of a conglomerate named Libra Group. *Id.* ¶¶ 4-5; Dkt. No. 22 ("Patrignani Decl.") ¶ 3.

---

[1] *See Convergen Energy LLC v. Brooks*, 2020 WL 5549039, at *1-4 (S.D.N.Y. Sept. 16, 2020); *id.*, 2020 WL 4500184, at *1-3 (S.D.N.Y. Aug. 5, 2020); *id.*, 2020 WL 4038353, at *1-2 (S.D.N.Y. July 17, 2020).

On November 5, 2019, NianticVista Energy, LLC ("Niantic") made an offer to Convergen for CEW. The offer letter stated: "As a condition to closing, a supply agreement between the Company and its affiliate, the L'Anse Warden Electric Company, must be executed under standard market terms." Patrignani Decl. ¶ 11. Effective January 29, 2020, Convergen, CEW, and Niantic signed an agreement to sell CEW to Niantic for $5.5 million (the "Acquisition Agreement"). The sale closed on January 31, 2020 (the "Acquisition"). *See Convergen Energy*, 2020 WL 5549039, at *1-2.

On January 31, 2020, concurrent with the Acquisition and as contemplated by it, L'Anse entered into a supply agreement with CEW (the "Supply Agreement"). Dkt. No. 4 ¶ 2; Hansen Decl., Ex. A (the Supply Agreement). The Supply Agreement provided that CEW, as the seller, would supply to L'Anse, as the buyer, a minimum quantity of 40,000 total tons per year of engineered fuel pellets in return for L'Anse's agreement to pay CEW a base price of $50 per ton, to be adjusted on each anniversary date of the effective date of the Supply Agreement. Hansen Decl., Ex. A at 2. L'Anse was required to pay invoices no later than 30 days after receipt of each weekly invoice. *Id.* at 3. The Supply Agreement was signed by Gregory Merle on behalf of CEW and by Fidel Andueza on behalf of L'Anse. *Id.* at 4.

Prior to the Supply Agreement, there was no contract for fuel pellets between CEW and L'Anse. L'Anse ordered pellets at its sole discretion and CEW billed L'Anse via invoice. As part of the sale transaction and pursuant to the Supply Agreement, CEW agreed to sell to L'Anse and L'Anse agreed to purchase from CEW specified quantities of fuel pellets at specified prices over a ten-year time period. CEW produces the fuel pellets in Green Bay, Wisconsin and then ships them to a Michigan warehouse or directly to the L'Anse facility. L'Anse receives the fuel pellets from that warehouse for use or directly from CEW's Green Bay facility, and CEW bills

L'Anse for pellets received.  Title to the goods transfers when L'Anse receives the pellets at its facility.

Prior to the sale of CEW, L'Anse and CEW were co-borrowers under a credit facility with BMO Harris Bank, N.A. ("BMO").  The facility included a term loan, a line of credit, and a letter of credit which was placed as an operating security under a provision of a power purchase agreement to which L'Anse was a party.  Hansen Decl. ¶ 8.

Simultaneous with the execution of the Supply Agreement, CEW and L'Anse each entered into a Collateral Assignment with BMO, dated January 31, 2020, pursuant to which each party collaterally assigned to BMO all of its rights, title, and interest of, in, and to the Supply Agreement and granted to BMO a security interest in the rights and remedies of such party under the Supply Agreement.  Hansen Decl., Ex. A at 1.  To that end, each party to the Supply Agreement agreed that they would not terminate the Supply Agreement without providing a notice of default to BMO and agreed further that in the event of a default, BMO would have a right to cure the default.  *Id.*  CEW and L'Anse agreed that upon BMO succeeding to a party's interest under the Supply Agreement pursuant to the Collateral Assignment of such party, the other party would treat BMO as a party to the Supply Agreement and to be bound by and perform all of the obligations and conditions imposed upon such other party under the Supply Agreement.  *Id.* at 1-2.  The events of default include a material breach or threatened material breach of the Supply Agreement that has not been cured within a commercially reasonable time not to exceed 30 days following the receipt of written notice of the breach or threatened breach.  *Id.* at 1.

On or about April 1, 2020, L'Anse ceased making any payments to CEW due to its contention that the Supply Agreement was procured by fraud.  Hansen Decl. ¶ 11.  CEW claims

3

that as of June 10, 2020, L'Anse owed CEW roughly $300,000, with that amount continuing to increase with each shipment of payments. *Id.* L'Anse claims to be operating under the status quo prior to the alleged fraud and seeks to offset its damages against the amounts it owes to CEW. Patrignani Decl. ¶ 5; Dkt. No. 20 at 8.

Despite not making payments, L'Anse continues to request and receive pellets at its facility and has not raised any issues with the quality of the pellets or otherwise suggested that CEW has not performed its obligations under the Supply Agreement. Hansen Decl. ¶ 13. CEW has sent invoices and otherwise made repeated demands that L'Anse pay its debt. *Id.* ¶ 15; *id.*, Ex. C. L'Anse also has not given notice of default to BMO as is required if any party seeks to terminate the agreement for default. *Id.* ¶ 16; *id.*, Ex A at 1.

Pursuant to the Supply Agreement, disputes under the agreement are to be resolved using binding arbitrations through the American Arbitration Association ("AAA"). Hansen Decl., Ex. A at 6. At the same time, the Supply Agreement explicitly preserves the right of any party to approach the Court to seek injunctive relief. Under "Additional Terms and Conditions," the Supply Agreement states:

> Each party acknowledges and agrees that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms. Accordingly, pending completion of arbitration pursuant to this provision, either party shall have the right to seek a temporary restraining order, injunctive relief or other interim or provision relief on the grounds that such relief would otherwise be available at law or in equity. If any such relief is obtained, the arbitrator will address the continuance, modification or termination of such relief, and the decision regarding such relief shall be binding on the parties.

Hansen Decl., Ex. A at 7.

## PROCEDURAL HISTORY

On June 4, 2020, CEW filed an arbitration demand with the AAA against L'Anse seeking to recover payments due under the Supply Agreement.

On June 10, 2020, CEW filed suit against L'Anse in the Circuit Court for Dane County, Wisconsin seeking injunctive relief requiring L'Anse to continue to perform under the Supply Agreement. The action was subsequently removed to the District Court for the Western District of Wisconsin on June 15, 2020 under the caption *Convergen Energy WI, LLC v. L'Anse Warden Electric Company, LLC*, 20-cv-0543 (W.D. Wis.).

On June 16, 2020, CEW moved for a preliminary injunction. The parties completed briefing on June 25, 2020. On July 6, 2020, L'Anse filed a motion for leave to file a sur-reply.

On July 8, 2020, the action was transferred to this Court. In the district court's order granting transfer, the Honorable William M. Conley stated that he would not take up the motion for preliminary injunction due to the transfer. *See Convergen Energy WI, LLC*, 20-cv-0543 (W.D. Wis. July 8, 2020), Dkt No. 36.

After the action was transferred, CEW filed a letter in opposition to the motion for leave to file a sur-reply on July 13, 2020. On August 19, 2020 and September 10, 2020, CEW filed letters "to update the Court regarding the current status of the arbitration." Dkt. Nos. 47, 48. In the August 19, 2020 letter, CEW informed the Court that L'Anse had recently stopped requesting pellets from CEW and that CEW intended to assert a claim based on that refusal in the arbitration. Dkt No. 47 at 1 n.2. At the same time, CEW stated that it did not anticipate a need to raise these claims before this Court. *Id.*

This Court granted the motion to file the sur-reply largely to respond to new arguments and new factual assertions in Plaintiff's reply brief. Dkt. No. 51. The Court also scheduled a conference and ordered the parties to submit a joint letter informing the Court on (1) whether CEW was still seeking a preliminary injunction; (2) the status of the arbitration and whether preliminary injunctive relief was available in that proceeding; and (3) whether the parties were

prepared to rest on their papers and accompanying declarations in connection with the motion for a preliminary injunction.  Dkt. Nos. 50, 51.

The parties filed the joint letter on September 22, 2020.  First, CEW informed the Court that it was still seeking preliminary injunctive relief.  Dkt No. 52 at 1.  Second, CEW further informed that an arbitrator had been proposed, but not confirmed, and that L'Anse planned to file an objection to the proposed arbitrator and a request that the Supply Agreement arbitration be consolidated with the Acquisition Agreement arbitration, which would require a three-person panel.  There would be some delay as a result of the need for the AAA to make a decision on that request and likely as a result of other procedural motions.  CEW also informed the Court that it had asked for preliminary injunctive relief in the Supply Agreement arbitration.  Finally, L'Anse indicated that it was prepared to rest on its papers (and therefore not rely on oral testimony), but CEW asked for leave to file two supplemental declarations and for the additional relief of compelling specific performance.  *Id.* at 1-2.

Plaintiff further updated the Court on the status of the arbitration by letter of September 23, 2020.  L'Anse had objected to the arbitrator and AAA had given CEW five days to respond.  Thereafter, the matter would be placed before AAA's Administrative Review Council.  If the objection to the arbitrator and the process were sustained, the arbitrator selection process would begin anew, months after the arbitration was commenced on June 4, 2020.  Dkt No. 53 at 1.

The Court held the conference on September 25, 2020.  At that conference, it indicated that it would permit CEW to submit the two supplemental declarations but only if L'Anse were given an opportunity to challenge those declarations through expedited discovery.  The Court also offered CEW the alternative option of resting on its current papers, without the

supplemental declarations, and to have the hearing on the motion for the preliminary injunction within a week, to be followed by a speedy decision.

CEW accepted the second alternative and the Court scheduled a hearing for October 1, 2020. Both sides consented to the Court deciding the matter on the papers with the October 1, 2020 hearing to be limited to oral argument.

## DISCUSSION

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).[2] The movant seeking a preliminary injunction must prove each of the following elements: (1) likelihood of success on the merits; (2) irreparable harm absent injunctive relief; (3) that the public's interest weighs in favor of injunctive relief; and (4) that the balance of hardships tips decidedly in the movant's favor. *See id.* at 20; *Metro Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). Moreover, "[a] showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faively Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009); *see Singas Famous Pizza Brands Corp. v. N.Y. Adver. LLC*, 468 F. App'x 43, 45 (2d Cir. 2012). "To satisfy the irreparable harm requirement, Plaintiff[] must demonstrate that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until

---

[2] Even where the parties have agreed to arbitrate a dispute, the "Second Circuit has repeatedly held that courts retain the power, and the responsibility, to consider applications for preliminary injunctions while a dispute is being arbitrated." *General Mills, Inc. v. Champion Petfoods USA, Inc.*, 2020 WL 915824, at *3 (Feb. 26, 2020) (citing cases); *see Am. Exp. Fin. Advisors Inc. v. Thorley*, 147 F.3d 229, 231 (2d Cir. 1998) ("[C]ourts should consider the merits of a requested preliminary injunction even where the validity of the underlying claims will be determined in arbitration."); *Roso-Lino Beverage Distributors, Inc. v. Coca-Cola Bottling Co.*, 739 F.2d 124, 125 (2d Cir. 1984) ("The fact that a dispute is to be arbitrated, however, does not absolve the court of its obligation to consider the merits of a requested preliminary injunction.").

7

the end of trial to resolve the harm." *Faively*, 559 F.3d at 118 (quoting *Grand River Enter. Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007)).  The "mere possibility of irreparable harm is insufficient to justify the drastic remedy of a preliminary injunction."  *Borey v. Nat'l Union Fire Ins. Co.*, 934 F.2d 30, 34 (2d Cir. 1991).

Where, however "(i) an injunction will alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits," the Second Circuit requires the movant to meet a higher standard.  *Tom Doherty Assocs., Inc.  v. Saban Ent., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995).  The movant must make "a clear showing that [it] is entitled to the relief requested, or [that] extreme or very serious damage will result from a denial of preliminary relief."  *Id.* at 34 (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985)); *see Yang v. Kosinski*, 960 F.3d 119, 127-28 (2d Cir. 2020); *see also JN Contemporary Art LLC v. Phillips Auctioneers LLC*, 2020 WL 4014985, at *3-4 (S.D.N.Y. July 15, 2020); *Patrick v. Local 51, Am. Postal Workers Union, AFL-CIO*, 2020 WL 703392, at *2 (S.D.N.Y. Feb. 11, 2020).

In *Tom Doherty Associates*, the Second Circuit stated:

> If the use of a heightened standard is to be justified, the term "all the relief to which a plaintiff may be entitled" must be supplemented by a further requirement that the effect of the order, once complied with, cannot be undone.  A heightened standard can thus be justified when the issuance of an injunction will render a trial on the merits largely or partly meaningless, either because of temporal concerns, say, a case involving the live televising of an event scheduled for the day on which preliminary relief is granted, or because of the nature of the subject of the litigation, say, a case involving the disclose of confidential information.  The bottom line is that, if a preliminary injunction will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial, then the plaintiff should have to meet the higher standard of substantial or clear showing of, likelihood of success to obtain preliminary relief.

8

60 F.3d at 35; *see also Moore v. Consol. Edison Co. of New York*, 409 F.3d 506, 511 (2d Cir. 2005); 11A Charles A. Wright and Arthur R. Miller, Federal Practice and Procedure § 2948 (3d ed. 2020) (hereinafter, "Wright and Miller").

Several rules follow from these principles. First, "[c]onclusory allegations lacking supporting evidence will not support a preliminary injunction." *Crichlow v. Fischer*, 2015 WL 678725, at *8 (S.D.N.Y. Feb. 17, 2015); *see Hancock v. Essential Res., Inc.*, 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."); *see also Int'l Home Care Servs. of New York, LLC v. People's United Bank, Nat'l Ass'n.*, 2020 WL 5752187, at *5 (E.D.N.Y. Sept. 24, 2020) ("Other than the conclusory assertions that its business may close, [p]laintiff has not proffered evidence showing that its business could not be returned to the status quo ante with money damages at the conclusion of this case."). Second, a movant cannot manufacture its own exigency and "[i]f the harm complained of is self-inflicted, it does not qualify as irreparable." *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995); *see Sun Chem. Corp. v. Dainippon Ink & Chems., Inc.*, 635 F. Supp. 1417, 1423 (S.D.N.Y. 1986) (denying preliminary injunction because the injury was avoidable). Third, irreparable harm does not exist where alternatives are available to a movant, even if "these alternatives are less convenient." *Molloy v. Metro Transp. Auth.*, 94 F.3d 808, 813 (2d Cir. 1996); *see New Pac. Overseas Grp. (USA) Inc. v. Excal Int'l Dev. Corp.*, 1999 WL 285493, at *8 (S.D.N.Y May 6, 1999). Fourth, "specific relief is not the conventional remedy for breach of contract" and "[i]f an injury can be appropriately compensated by an award of monetary damages, then an adequate remedy at law exists, and no irreparable injury may be found to justify specific relief." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d Cir. 2004).

CEW principally makes two arguments in support of its request for preliminary injunctive relief.  First, it argues that "the question of irreparable harm is answered by the language of the Supply Agreement itself, under which the parties recognize and acknowledge 'that the other party would be damaged irreparably in the event any of the provisions of this Agreement are not performed in accordance with their specific terms.'"  Dkt. No. 6 at 4 (quoting Hansen Decl., Ex. A at 7).  Second, invoking the security interest that BMO holds in the Supply Agreement as well as the importance of the CEW fuel pellets to L'Anse and the potential disruption to L'Anse if it is not supplied the pellets, CEW argues that:

> [L'Anse]'s brazenly intentional failure to pay [CEW] along with its stated intent to continue to take [CEW] pellets without paying, endangers both companies. The failure to pay, if not corrected, will begin tipping dominoes, risking BMO's withdrawal of the financial support to both parties that is conditioned upon the continuation of the Supply Agreement.  The withdrawal of that support would be a disastrous and potentially existential threat to [CEW] (and likely [L'Anse] as well).

Dkt No. 29 at 10.

The first argument is readily dismissed.  The parties to a contract cannot secure by agreement among themselves the equitable power of the court.  *See Baker's Aid, a Div. of M. Raubvogel Co. v. Hussman Foodservice Co.,* 830 F.2d 13, 16 (2d Cir. 1987) ("[T]he contractual language declaring money damages inadequate in the event of a breach does not control the question whether preliminary injunctive relief is appropriate."); *see also Coventry Capital US LLC v. EEA Life Settlements, Inc.*, 2018 WL 7080327, at *2 (S.D.N.Y. Dec. 17, 2018) (same); *Int'l Creative Mgmt. Inc. v. Abate*, 2007 WL 950092, at *6 (S.D.N.Y. Mar. 28, 2007) (same).

Plaintiff's second argument is supported only by conclusory statements.  Plaintiff's counsel states, what is repeated in Plaintiff's brief, that L'Anse's failure to pay if not corrected "will begin tipping dominoes" and "risk[s]" BMO's withdrawal of financial support which, in turn, would be a "disastrous and potentially existential threat" to CEW.  Dkt. No. 30 ¶ 8.  He also

10

states that "[i]f this continues, [CEW] will be forced to scale back operations, laying off essential Wisconsin employees whose specialized training an experience in this niche industry cannot be easily replaced," and that "[w]ithout access to credit and faced with an irreparable loss of talent, [CEW] will not exist in its current form (if at all) after lengthy arbitration." *Id.* ¶ 10.  He further asserts that without L'Anse's payments, CEW will not pay its business partners, "which will irreparably damage these key relationships." *Id.* ¶ 11.  The only hard fact asserted by Plaintiff's counsel is that the Supply Agreement accounts for approximately 50 percent of CEW's sales. *Id.* ¶ 9.

L'Anse responds with the declaration of Camilo Patrignani.  Patrignani managed CEW from the time it was a pilot facility in 2010 until he transitioned to a different energy related role at Libra Group in 2015.  Dkt. No. 34 ¶ 2.  He states that he had spoken to BMO about the dispute between the parties and the fraud allegations surrounding the Supply Agreement, and "BMO did not indicate an intent to withdraw financial support." *Id.* ¶ 4.  He asserts that based on his review of the audited financial statements of Convergen and CEW for 2019, "CEW will not only be able to pay all operational expenses but will continue to be profitable if L'Anse ceases to purchase pellets from CEW." *Id.* ¶ 5.  He also notes that CEW is paid significant tipping fees to accept waste from suppliers, which is then converted to the pellets, and that CEW applied for a Paycheck Protection Program forgivable loan of at least $400,000 that is helping to sustain its operations, including employee payroll. *Id.* ¶¶ 6-7.

The Court finds that Plaintiff has not satisfied its burden to clearly demonstrate the threat of irreparable harm.  It is true that there is "no ironclad rule" against the issuance of a preliminary injunction for a breach of contract.  *Register.com*, 356 F.3d at 404.  Injunctive relief is permissible when, for example, the movant presents evidence that it would be "impossible to

estimate 'with any precision the amount of the monetary loss which has resulted and which would result in the future'" as a result of the non-movant's contract breaches. *Id.* (citation omitted).  It is also permissible when "it would be very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 68-69 (2d Cir. 1999).  Courts have also granted preliminary injunctive relief "when the potential economic loss is so great as to threaten the existence of the moving party's business . . . even though the amount of direct financial harm is readily ascertainable." Wright and Miller § 2948.1; *see also Rex Medical L.P. v. Angiotech Pharma (US), Inc.*, 754 F. Supp. 2d 616, 622-23 (S.D.N.Y. 2010) (finding irreparable harm and granting preliminary injunctive relief where, as a result of defendant's breach of contract, plaintiff was deprived of the opportunity to sell an entire line of merchandise comprising 90% of its business, which would lead to a reduction in workforce, severely impact profitability, and injure goodwill and reputation).

Plaintiff's evidence does not approach the quality of the evidence in those cases or that is necessary to support preliminary injunctive relief.  Plaintiff has not offered evidence that the amount of loss it has suffered, or is likely to suffer, from Defendant's non-payment of the invoices and decision to cease ordering pellets would be difficult to calculate nor has it presented evidence that the loss will be so great as to threaten the existence of its business.  It relies primarily on the risk that BMO will withdraw its financial support to both parties if L'Anse continues to fail to pay and the follow-on damage that such withdrawal of support will cause Plaintiff.  It also relies on the generalized statement that "[i]f this continues," it will be forced to scale back operations and will cease to exist "after lengthy arbitration." Dkt. No. 30 ¶ 10.  But, on this record, the risk that BMO will withdraw its support and the corresponding risk that CEW

will be forced to scale back its operations in a manner that will prevent it from being able to scale back up is entirely speculative. There is no evidence that BMO has withdrawn its support or threatened to do so. There is no evidence that, if it threatened to do so, the parties—both of whom apparently need financial support—would be unable to reach an accommodation with BMO that would permit the continued support without need for court intervention. Although Plaintiff asserted the contrary at argument, there also is no evidence that if BMO withdraws its support, CEW will not be able to find some other source of credit that will sustain it until the time that the rights of the parties are adjudicated and until CEW is paid or receives damages, if it is so entitled. Any of these factors alone would likely defeat Plaintiff's request for preliminary injunctive relief. Together, they are fatal.

As to the loss of revenue to the business, the loss of 50% of CEW's sales is undoubtedly large and will have an impact on CEW's business during the time period before the arbitration is resolved; however, Plaintiff has offered no evidence that the follow-on consequences of which it fears are either actual or imminent.

Finally, to the extent that Plaintiff asserts that the length of the arbitration itself and the time it will take the arbitrators to make a decision on the preliminary relief will cause it irreparable harm, the Court notes that the problem is, to a large degree, of Plaintiff's own manufacture. CEW was the party who invoked arbitration regarding the Supply Agreement and only thereafter initiated this litigation. It did not need to invoke arbitration. L'Anse moved to stay the arbitration in favor of litigation before this Court, but CEW opposed that motion. The Court denied L'Anse's motion to stay the arbitration. *Convergen Energy*, 2020 WL 4500184, at *8. Similarly, L'Anse (and other Libra Group entities) initiated litigation in this Court regarding the Acquisition Agreement and CEW moved to dismiss based on the arbitration clause in the

Supply Agreement.  The Court ordered those claims to arbitration.  *Id.*, 2020 WL 5549039, at *18.  If CEW wanted expedition and feared that there would be delay in arbitration, it could have asked for expedited discovery and an expedited trial on a permanent injunction.  It would not have been burdened with the requirement to prove irreparable harm necessary for preliminary injunctive relief.

That is not the choice CEW made.  At argument, CEW candidly admitted that it eschewed litigation and chose arbitration believing that that process would be more expedited.  But, having so chosen and having deprived L'Anse of its forum of choice, CEW cannot be heard to complain that it guessed wrong and that this Court should grant, what is in effect, mandatory and ultimate relief because otherwise CEW would have to wait too long for relief through arbitration.  CEW created that exigency and now has to live with it.

Given the Court's findings on irreparable harm, it is unnecessary for the Court to address the likelihood of success on the merits and the various arguments made by the parties as to that issue.

SO ORDERED.

Dated: October 5, 2020
       New York, New York

LEWIS J. LIMAN
United States District Judge